In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-3010 & 98-3817

Lowell E. Harter and Doretta Harter,

Plaintiffs-Appellants,

v.

Iowa Grain Co., et al.,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 2936--Milton I. Shadur, Judge.

Argued September 13, 1999--Decided April 21, 2000

Before Posner, Chief Judge, and Cudahy and Kanne,
Circuit Judges.

Cudahy, Circuit Judge. The recent proliferation of so-called "hedge-to-arrive" contracts for the sale of grain has pitted many American farmers against their counterparts in the grain storage and marketing industry. The case before us involves these contracts, and these players, but it also wends its way into questions of arbitration and attorney's fees. A familiarity with hedge-to-arrive contracts will be helpful to understanding the issues in the case.

I.  Introduction

Farmers often contract to sell grain to grain elevators at some specific time in the future. Such contracts guarantee farmers a buyer for their grain and guarantee grain elevators a supply of a commodity. The contracts generally specify the quantity and quality of grain to be sold, as well as a delivery date and a price for the grain. Both parties, by agreeing in advance to the grain price, take a risk that the market will move against them. The farmer's risk is that grain prices will be higher at the time of delivery, thus causing him to forego profit by selling at too low a price; the elevator's risk is that prices will drop, causing it to purchase unduly expensive grain. "Hedge-to-arrive" contracts (HTA contracts) attempt to alleviate

these risks by introducing price flexibility. See The Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 319 (6th Cir. 1998). HTA contracts use two price indices--a "futures reference price," set by the Chicago Board of Trade for some time in the future, and a "local cash basis level," which is a local adjustment to the national price. See id. In an HTA contract, the parties generally agree at the time of contracting on the national portion of the price, and defer agreement on the local part of the price. See id. Many HTA contracts are "flexible," meaning the parties may "roll" the established delivery date to some point in the future. See id. When an elevator enters an HTA contract, it usually "hedges," or tries to offset the risk of paying unduly high prices, by buying an equal and opposite position in the futures market. See id. If either party to an HTA contract rolls the delivery date forward, the elevator buys back its original hedge and rehedges by purchasing a new futures contract. See id. The spread between the original hedge position and the "rolled" hedge position is attached to the price per bushel of the original HTA contract, and the farmer runs the risk of assuming a debit. See id.

The Commodity Exchange Act (CEA), codified at 7 U.S.C. sec. 1 et seq., and regulations promulgated under it govern contracts for sale of a commodity for future delivery--futures contracts. The CEA specifically excludes from the definition of futures contracts--and thus from its reach--the sale of a cash commodity for deferred shipment or delivery--cash forward contracts. See 7 U.S.C. sec. 1a(11); see also The Andersons, 166 F.3d at 318. "HTAs began as simple variants of cash forward contracts, but soon began to acquire more and more characteristics of futures contracts. This process has progressed to the point that it is now possible to argue that newer versions of HTAs are more like speculative futures contracts than cash forward contracts." Charles F. Reid, Note, Risky Business: HTAs, the Cash Forward Exclusion and Top of Iowa Cooperative v. Schewe, 44 Vill. L. Rev. 125, 134 (1999). Several courts have concluded that HTA contracts are cash forward contracts that may be sold off-exchange./1 But the CFTC has leaned towards characterizing HTAs as futures contracts that must be sold on designated exchanges./2

II. Background

Lowell Harter was, until his retirement, a corn farmer in Grant County, Indiana. "The Andersons" is a corporation that operates grain elevators around the Midwest. The Andersons was not, at the time of the transactions in question, a futures commission merchant (FCM) registered with the

Commodity Futures Trading Commission./3 In 1993, The Andersons began marketing HTA contracts. The Andersons solicited Harter, who entered into five such contracts in November 1994. Harter contends that an employee of The Andersons told him the contracts were "no risk" plays on the futures market. The Andersons counters that the contracts clearly stated that "the commodities represented under this contract will be tangibly exchanged." Appellee's Br. at 4. The Andersons implies that Harter understood that the contracts called for him to turn over corn or its cash equivalent at some point in the future, suggesting that the risk of loss was apparent.

Harter claims that a few months later, presumably at the delivery obligation date, The Andersons notified him that he owed them $16,941.69 (we assume--neither party specifies-- that The Andersons requested and Harter refused delivery of the corn, thus giving rise to an obligation to furnish its cash equivalent). Harter was surprised, he says, because he thought the HTAs were "no risk." Harter says that the parties agreed he would tender a check for the amount, and they would simultaneously enter into new HTA contracts designed to capitalize on the market and generate enough profit to cover the initial loss. See Appellant's Br.I at 3./4 The Andersons does not directly respond to this, but states that the parties agreed to extend the delivery periods for the contracts, or roll the contracts forward.

In May of 1995, apparently when the new delivery obligation date arrived, The Andersons sought delivery of the corn, which Harter again refused. The Andersons then told Harter he owed it approximately $50,000. The Andersons explains that this figure represents "the difference between the market price of corn and the price for the corn established by the contracts." Appellee's Br. at 6-7. Harter says that the figure represents the entire loss throughout the HTA contract period, less a $16,000 payment Harter made to cover the initial loss. Appellant's Br.I at 3.

Harter filed a class action lawsuit in the Northern District of Illinois against The Andersons, its subsidiary AISC and introducing broker Iowa Grain. Appellant's Supp. App.I at 24-35 (Harter v. Iowa Grain Co., No. 96 C 2936 (N.D. Ill. July 26, 1999) (first amended complaint)). Harter later dropped Iowa Grain, which Harter had erroneously believed to be The Andersons' principal, from the suit. See Appellant's Supp. App.II at 218-225 (Harter v. Iowa Grain, No. 97-2671 (7th Cir. July 15, 1998) (unpublished order reversing award of sanctions against Harter's

attorney)). Harter alleged that The Andersons had violated the Commodity Exchange Act, the federal Racketeer Influenced and Corrupt Organizations Act (RICO), the Indiana RICO statute, and had committed common law fraud, breach of fiduciary duty and intentional infliction of emotional distress. The contracts Harter had signed expressly provided that in the event of a dispute, the National Grain & Feed Association (NGFA) would arbitrate. After Harter filed suit, The Andersons petitioned the district court, pursuant to the Federal Arbitration Act, 9 U.S.C. sec. 1 et seq., to stay proceedings and to compel arbitration. The district judge granted the motion. The NGFA arbitrators entered an award in favor of The Andersons, and ordered Harter to pay contract damages of $55,350 plus interest, as well as $85,000 in attorney's fees plus interest. Harter moved to vacate or modify the award; The Andersons moved to confirm it. On July 24, 1998, the district court entered an order confirming the arbitration award in its entirety. It subsequently granted The Andersons' request that Harter bear the attorney's fees that The Andersons incurred in non-arbitration portions of the litigation. Harter now appeals the district court's order compelling arbitration, its order affirming the award and its order regarding attorney's fees.

III.  The Order Compelling Arbitration

  The contracts at issue provide for the arbitration of "any disputes or controversies arising out of" those contracts. See, e.g., Appellant's Supp. App.I at 71-82 (duplicates of Harter HTA contracts). The Federal Arbitration Act provides that a court must stay its proceedings and compel arbitration if it is satisfied that an issue before it is arbitrable under the parties' agreement. See 9 U.S.C. sec. 3. The district court in the present case did just that, and Harter protests. We review the district court's order compelling arbitration de novo. See Matthews v. Rollins Hudig Hall Co., 72 F.3d 50, 53 (7th Cir. 1995).

  "The primary issue before the court," Harter explains, "is whether [CFTC regulations governing predispute arbitration] invalidate[ ] the arbitration clause in the . . . contracts." Appellant's Reply Br. at 1. Harter does not identify any respect in which the clauses themselves violate CFTC regulations, for instance by excluding required consumer protection language. However, Harter insists that "the . . . contracts violate the prohibition of the Commodity Exchange Act . . . against the sale of off-exchange futures contracts . . . by unregistered persons or entities through fraud."

Id. (citations omitted). We understand him to argue that the contracts themselves are illegal; if this argument is correct, he posits, the contracts are void and the arbitration clauses in them are ineffective. Consequently, the district court order compelling arbitration would have been in error.

Under section 4 of the Federal Arbitration Act, 9 U.S.C. sec. 4, a federal court must order arbitration "once it is satisfied that 'the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue.'" Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403 (1967) (quoting 9 U.S.C. sec. 4). Courts "will not allow a party to unravel a contractual arbitration clause by arguing that the clause was part of a contract that is voidable . . . ." Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Communications Int'l Union, 20 F.3d 750, 754 (7th Cir. 1994). "The party must show that the arbitration clause itself, which is to say the parties' agreement to arbitrate any disputes over the contract that might arise, is vitiated by fraud, or lack of consideration or assent . . . ." Id. (emphasis added). Neither Harter's complaint nor his motion opposing compelled arbitration alleges that the arbitration provisions themselves were the product of fraud, inadequate consideration or the like. Instead, he attacks the legality of each contract as a whole. Thus, under the Federal Arbitration Act and cases construing it, the dispute arising from the contracts-- namely, the legality of the contracts under the CEA--is arbitrable.

In this respect, Harter's case is a duplicate of Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd., 1 F.3d 639 (7th Cir. 1993). In that case, two parties signed an agreement under which one would market the other's trademarked product. The agreement called for all disputes "arising out of" it to be arbitrated. The marketer was offered a franchise agreement, which was never executed. Eventually the producer severed the relationship entirely and allegedly attempted to put the marketer out of business. See id. at 640. The marketer sued in state court, and the producer removed to federal court and asked the court to stay proceedings pending arbitration. The marketer argued that it was the purchaser of an unregistered franchise; the Illinois Franchise Act allowed such purchasers to sue for recision of the offending contract. See id. The marketer therefore argued that the contract which called for arbitration should be rescinded by the court, and the dispute should be resolved in court. We stated that the

"interesting, if not somewhat metaphysical"
question at issue was whether "a dispute, which
has as its object the nullification of a
contract, 'arise[s] out of' that same contract."
Id. at 641.

We held in Sweet Dreams that where a dispute
has its origins in an agreement that calls for
arbitration, the court cannot decide the merits
because the dispute "arises out of" the agreement
and is subject to arbitration. Id. at 642-43.
Therefore, in Sweet Dreams, whether the marketer
was the purchaser of a registered or unregistered
franchise under state statute was, pursuant to
the Federal Arbitration Act, a matter for the
arbitrator and not for the court. See id. Just so
here./5 The Harter contracts say that any
dispute "arising out of" the contract will be
arbitrated. See, e.g., Supp. App.I at 71-83
(duplicates of HTA contracts; attorney's fee
provision found at para. 5 in each). Harter, like
the marketer in Sweet Dreams, makes a legal
argument that he is protected by a statute that
would invalidate the agreement. Because his
contentions "arise out of" his contract, they are
matters for the arbitrator.

Next, Harter embarks down an alternate
rhetorical route to arrive at his preferred
destination--federal court. He suggests that even
if the court cannot decide the merits of his
claim, the court must assume that the claim is
valid for the purpose of evaluating the motion to
compel arbitration./6 If we were to accept this
sophistry, we would essentially be directing the
case to the district court. For if, based on our
assumption, the arbitrators have no power, who
but the court may hear this case? Fortunately,
the argument is meritless, and we need not tax
the district court further. Harter marshals
Schacht v. Beacon Insurance Co., 742 F.2d 386
(7th Cir. 1984), which states that "an order to
arbitrate the particular grievance should not be
denied unless it may be said with positive
assurance that the arbitration clause is not
susceptible of an interpretation that covers the
asserted dispute." Id. at 390 (quoting United
Steelworkers v. Gulf Navigation Co., 363 U.S.
574, 582-83 (1960)) (emphasis added). Based on
this single word, Harter would have us take as
true his assertions that these contracts violated
the CEA and are therefore void. But reading
Schacht as a whole, this is clearly wrong.

In Schacht, a reinsurance company contracted to
cover the losses of an insurance company. 742
F.2d at 388-89. The contract included an
arbitration clause. See id. The reinsurer asked
the insurer for an "advance premium," and when
none was forthcoming, sent a notice of

cancellation to the insurer. Id. The insurer responded that the contract called for 180 days notice before cancellation, and stated that it assumed the contract remained in force. See id. The insurer later sought coverage for its losses, and the reinsurer failed to pay the claim. See id. The insurer sought arbitration, and the reinsurer stated that the contract was void, thus relieving it of the duty to arbitrate. See id. We said that it was clear the parties had a contractual relationship, but granted the possibility that if the reinsurer was correct, some of the contractual provisions were unenforceable. We then concluded that "[t]he claims raised by [the reinsurer] are susceptible to resolution through the arbitral process." Id. at 390. So despite Harter's creative interpretation of Schacht, the case ultimately weighs against his point of view. Clearly the parties in the present case had a contractual relationship--the record includes copies of the documents signed by both parties. See Appellant's Supp. App.I at 71-83 (duplicates of Harter's HTA contracts). Notwithstanding the merits of Harter's claims that the contractual terms with The Andersons were not enforceable, Schacht (along with Sweet Dreams, Colfax Envelope and Prima Paint) instructs that the NGFA arbitration panel was the ultimate forum for those claims./7

Not easily deterred, Harter makes an alternative effort to keep this dispute out of the arbitrators' hands. He argues that even if the arbitration clauses are valid, a court is better suited to pass on the legal status of the contracts than is an arbitrator. This argument is not altogether fanciful. The Ninth Circuit has stated that questions of law regarding statutory rights are best left to judicial interpretation. Marchese v. Shearson Hayden Stone, Inc., 734 F.2d 414, 419-20 (9th Cir. 1984). The Marchese court concluded that "[i]t is up to case-by-case interpretation to determine which statutes are such that an arbitrator can consider the statutory claim." Id. The plaintiff in Marchese had asked for a declaratory judgment stating that the Commodity Exchange Act allowed customers to retain "interest and increment" on margin deposits in excess of their brokerage fees. See id. at 419. The Ninth Circuit considered this a claim requiring pure legal interpretation of the Commodity Exchange Act, and held that it was uniquely suited for judicial resolution, and that the district court's order to compel arbitration was in error. See id. at 421.

Though Marchese nicely reflects Harter's point of view, it does not persuade us. Why? First, the CEA claim at issue here--that Harter's HTA

contracts are futures instruments rather than cash market transactions--is not a pure question of law, but requires a fact-intensive inquiry. We have stated that "[a]lthough cash forward contracts and futures contracts are easily distinguishable in theory, it is frequently difficult in practice to tell whether a particular arrangement between two parties is a bona fide cash forward contract for the delivery of grain or whether it is a mechanism for price speculation on the futures market." Lachmund, 191 F.3d at 787. Lachmund instructed that we examine the facts of the case, beginning with the words of the contract itself, and moving on to "the course of dealings between the parties and the totality of the business relationship." Id. Thus, this case is unlike the pure question of law presented in Marchese./8

Harter takes a final swipe at the arbitration order. He rightly recounts that arbitration is a matter of contract, and that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." See United Steelworkers, 363 U.S. at 582. Based on this truism, he floats two contractual arguments: first, he did not intend for a claim regarding the validity of the HTA contracts to be arbitrated; second, The Andersons did not intend that this claim be arbitrated. Harter claims to have received "something completely different" than what he "bargained for" when his claim was adjudicated by the NGFA panel. Appellant's Br.I at 26. But the arbitration clauses in his contracts state that "any disputes or controversies arising out of th[ese] contract[s] shall be arbitrated by the National Grain & Feed Association, pursuant to its arbitration rules." Appellee's Supp. App. at 49-58 para. 136 of "Standard Purchase Contract Terms" (emphasis added). So Harter--like it or not--got exactly what he bargained for.

Equally implausible is Harter's claim that The Andersons did not intend the NGFA to arbitrate the claim. He furnishes us records showing that the NGFA had not arbitrated claims of fraud or misrepresentation before the groundswell of HTA disputes. This evidence does not suggest that the Andersons did not intend NGFA to arbitrate such a dispute. In fact, if any inference can be drawn from the fact that the NGFA began hearing fraud and misrepresentation claims as soon as the HTA controversies arose, it is that the NGFA was the natural forum to which the parties to these disputes turned. We therefore affirm the district court's grant of the motion to compel arbitration.

IV.  Structural Bias of the NGFA Arbitration Panel

The Andersons asked the district court to confirm the NGFA panel's award, which it did. Harter now argues to us, as he did below, that this decision was erroneous because the NGFA panel was biased against him. When reviewing the district court's confirmation of the arbitration award, we decide questions of law de novo and review findings of fact for clear error. See Employers Ins. of Wausau v. Banco de Seguras Del Estado, 199 F.3d 937, 941 (7th Cir. 1999).

Parties to an arbitration contract agree to trade procedural niceties for expeditious dispute resolution. See Dean v. Sullivan, 118 F.3d 1170, 1173 (7th Cir. 1997). The Federal Arbitration Act permits us to upset the parties' bargain by vacating an arbitration award only in very specific situations. See 9 U.S.C. sec. 10. Harter argues that this arbitration is such a situation because there was "evident partiality . . . in the arbitrators . . ." in violation of section 10(a)(2) of the Act. 9 U.S.C. sec. 10(a)(2). We have stated that "evident partiality" exists when an arbitrator's bias is "direct, definite and capable of demonstration rather than remote, uncertain, or speculative." United States Wrestling Federation v. Wrestling Division of the AAU, Inc., 605 F.2d 313, 318 (7th Cir. 1979). Harter now asks us to recognize a subset of arbitral partiality, "structural bias." He contends that the NGFA is "structurally biased" against farmers because its members include grain elevators like The Andersons. Thus, he was "placed in the unenviable position of having to attempt to persuade NGFA members that a widespread practice of the association's membership is illegal." Appellant's Br.I at 32./9 Harter no doubt feels that the farmers' traditional adversaries were sitting in judgment over him.

Some notable jurists have harbored similar suspicions about the fate of customers appearing before arbitration panels populated by industry "insiders." For instance, when the Second Circuit required a securities buyer to arbitrate a fraud claim under the 1933 Securities Act against his broker, Judge Clark dissented. See Wilko v. Swan, 201 F.2d 439, 445-46 (2d Cir.), rev'd 346 U.S. 427 (1953). Judge Clark stated that "the persons to [adjudicate the dispute] would naturally come from the regulated business itself. Adjudication by such arbitrators . . . is surely not a way of assuring the customer that objective and sympathetic consideration of his claim which is envisaged by the Securities Act." Id. at 445 (Clark, J., dissenting). The Supreme Court adopted Judge Clark's point of view, stating that Congress's intent in passing section 14 of the

Securities Act was to "assure that sellers could not maneuver buyers into a position that might weaken their ability to recover under the Securities Act." Wilko v. Swan, 346 U.S. 427, 432 (1953). Section 14 created a non-waivable right to bring suit in federal court for such maneuvers, the Court determined. See id. at 434-35.

The Seventh Circuit adopted this reasoning in Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 558 F.2d 831 (7th Cir. 1977). In Weissbuch, we relied on Wilko to find that a Rule 10b-5 consumer fraud claim was not arbitrable. See Weissbuch, 558 F.2d at 835-36. The same year we decided Weissbuch, we held that an analogous CEA claim was arbitrable. See Tamari v. Bache & Co. (Lebanon) S.A.L., 565 F.2d 1194, 1199-1200 (7th Cir. 1977) (Tamari II). We reasoned that unlike the Securities Act of 1933 at issue in Wilko, the CEA had no non-waivable consumer protection provision. See Tamari II, 565 F.2d at 1199. Judge Swygert, in a persuasive dissent, relied on Wilko and Weissbuch to argue that commodities investors, like securities investors, were "vulnerable to fraudulent schemes perpetrated by industry insiders," and thus deserved a judicial forum for their claims. See id. at 1206 (Swygert, J., dissenting).

However perceptive Judge Swygert and Judge Clark may have been, the opposing view favoring arbitration has firmly won out. In 1989, the Supreme Court explicitly overruled Wilko, stating that it had "fallen far out of step with our current strong endorsement of the federal statutes favoring [arbitration as a] method of resolving disputes." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 481 (1989). Rodriguez de Quijas was the culmination of a series of pro-arbitration cases decided in the 1980s. In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985), the Court held that foreign arbitration panels could hear international antitrust claims under the Sherman Act. See id. at 639. In Shearson/American Express, Inc. v. McMahon, 482 U.S. 220 (1987), the Court held that industry panels could arbitrate most consumer claims under the Securities Exchange Act of 1934 and under RICO. See id. at 232-33, 238-39. Rodriguez de Quijas removed the final barrier to arbitration of section 14 Securities Act claims contained in Wilko./10

To avoid the arbitration pitfalls identified by Judges Swygert and Clark, we have required arbitrators to provide a "fundamentally fair hearing." See, e.g., Generica Ltd. v. Pharmaceutical Basics, Inc., 125 F.3d 1123, 1130 (7th Cir. 1997). We guarantee fairness by

steering clear of "evident partiality." And, in settings where arbitrators and litigants were structural adversaries, as Harter suggests they are here, we have never found evident partiality. For instance, we refused to set aside an award rendered in favor of a financial services company by a panel whose members were "drawn from persons in the commodities business." Tamari v. Bache Halsey Stuart, Inc., 619 F.2d 1196, 1201 (7th Cir. 1980) (Tamari IV, see id. at 1197 n.1). We reasoned that disqualifying arbiters with experience in the business would eviscerate the goals of arbitration. See id. at 1202 n.11. We also noted in Tamari IV that the customer had agreed to arbitrate before the "industry" panel. See id. at 1201-02. We have elsewhere stated that by virtue of their expertise in a field, arbitrators may have interests that overlap with the matter they are considering as arbitrators. See, e.g., Health Servs. Mgt. Corp. v. Hughes, 975 F.2d 1253, 1264 (7th Cir. 1992). Such overlap has not amounted to prima facie partiality. See id. at 1264; Tamari IV, 619 F.2d at 1201. Thus, even a prior business association between an arbitrator and a party is not sufficient evidence of bias to vacate an award. See Health Servs., 975 F.2d at 1264. Reviewing these cases, we find it difficult to imagine how courts might apply the "structural bias" standard Harter advocates. In an economy increasingly populated by large conglomerates with diverse interests, many individual arbitrators could be affiliated with companies only arguably adverse to one of the parties. Harter's standard would require disqualification, despite the practical reality that the arbitrators themselves would quite likely be impartial.

Although as a matter of first impression we might sympathize with Harter's frustration, we are in the mainstream in rejecting his "structural bias" argument./11 The First Circuit recently rejected an argument that an arbitration panel comprising financial employers was so inclined to side with employers that it could not adjudicate the claim of a female worker alleging gender discrimination. See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 14-15 (1st Cir. 1999). The Eleventh Circuit has affirmed the impartiality of a panel whose members were in the business of collecting futures debit balances from customers in a situation where the panel held a customer liable for such obligations. See Scott v. Prudential Sec., Inc., 141 F.3d 1007, 1015-16 (11th Cir. 1998). And, of particular relevance to us, the Sixth Circuit recently found in favor of The Andersons in a challenge to an NGFA arbitral award involving an HTA contract almost identical to Harter's. See Horton Farms, 166 F.3d at 328-

30. So precedent in this circuit and others, as well as the broad policy goals served by arbitration, require us to reject Harter's argument of "structural bias" in the NGFA. This issue is no longer open.

Thus, we will vacate the arbitration award only if Harter can show that the NGFA panel had direct bias against him. This standard is difficult to meet. For instance, in one of the few cases vacating an award because of arbitral bias, the Second Circuit objected when a son served as arbitrator of a dispute involving a local unit of an international union of which his father was president. See Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 84 (2d Cir. 1984).

Harter observes that the NGFA is an organization of grain merchandisers and their affiliates. See Appellant's Br.I at 30-31. Apparently, however, a number of farmer-owned cooperatives are also NGFA members. See Horton Farms, 166 F.3d at 326. On the other hand, one of The Andersons' top employees sits on the NGFA board. See id. at 325. The Andersons pays more than $26,000 in dues annually to the NGFA. See Appellant's Br.I at 31. And the NGFA has taken the public position that HTA contracts are not futures instruments. See id. Harter charges that a significant portion of NGFA members have written HTA contracts, and that NGFA arbitration rules do not disqualify arbitrators who have written HTA contracts. See id. at 32. Harter also charges that, prior to the influx of HTA cases, the NGFA arbitrated fewer than twenty cases involving farmers, and only vindicated farmers twice. See id. at 27 n.26. Harter alleges that almost half of the NGFA's members have written HTA contracts, while the NGFA points out that just half of those members responding to an HTA survey have done so. See Amicus Br. at 13 n.10. Even if all of these facts are true, they do not establish the direct, definite, demonstrable bias required by United States Wrestling Federation, 605 F.2d at 318. See also Horton Farms, 166 F.3d at 325-26 (finding that combination of procedural safeguards and membership of farmer-owned cooperatives indicated fairness of NGFA arbitral proceedings).

Under NGFA arbitration rules, an aggrieved party must first file a complaint with the NGFA national secretary. The parties then fully brief the dispute, and either party may request oral argument, though the requesting party bears the cost. The NGFA national secretary then appoints a three-member arbitration committee selected from the membership. The individual arbitrators must have expertise in the industry sector at

issue, but must be commercially disinterested in the particular dispute. See Amicus Br. at 12. Arbitrators must disclose any bias or financial interest that could influence their analysis; either party may object to any of the arbitrators. See id. The panel issues written opinions, and the parties may appeal. These facts suggest significant procedural safeguards for the parties.

Finally, Harter argues that the panel demonstrated its bias by granting an unsubstantiated request by The Andersons for attorney's fees, and delegating to the NGFA national secretary the task of verifying The Andersons' expenditures. It is true that, when a party claims arbitral bias, we must "scan the record" for evidence of partiality. See, e.g., Health Servs., 975 F.2d at 1258. Here, the NGFA panel unanimously found in favor of The Andersons, and awarded damages reflecting The Andersons' actual market loss, plus cancellation fees, plus compound interest calculated at 9 percent. It also cited a provision in Harter's contract stating that "seller shall also be liable for The Andersons' attorney's fees . . ." and stated that the Andersons "indicated that outside counsel fees and costs totaled approximately $85,000 through November 1996 in connection with the federal court case resulting from Harter's refusal to arbitrate the dispute . . . ." Appellant's App.I at 9 (The Andersons, Inc. v. Harter, NGFA Case No. 1788). The arbitration panel's written decision also recounted the ongoing court battle between the parties. Thus, although The Andersons had not submitted actual billing records, the panel had before it contract language calling for Harter to pay The Andersons' legal fees, The Andersons' estimate of its legal fees and evidence of the court battle giving rise to those fees. The decision to award attorney's fees subject to a detailed review by the NGFA national secretary was reasonable, and certainly does not prove direct bias against Harter. We therefore affirm the district court's confirmation of the arbitral award.

V.  Attorney's Fees

Harter finally complains that the district judge erred in finding that The Andersons was entitled to recover attorney's fees incurred for proceedings following the arbitration. Harter protests the award on two grounds: the Federal Arbitration Act does not authorize post-arbitration awards of attorney's fees and the contract authorizing fee shifting does not apply to proceedings ancillary to enforcement of the arbitration decision. We review the district

court's award of attorney's fees for abuse of discretion. See Connolly v. National Sch. Bus Serv., Inc., 177 F.3d 593, 595 (7th Cir. 1999).

As for Harter's first contention, he is correct that the Federal Arbitration Act does not authorize a district court to award attorney's fees to a party who successfully confirmed an arbitration award in federal court. See Menke v. Monchecourt, 17 F.3d 1007, 1009 (7th Cir. 1994). But Menke, the linchpin of Harter's argument against attorney's fees, recognizes two bases for deviating from the American rule that each party bear its own fees: (1) statutory authority for fee shifting and (2) contractual agreement between the parties. See id. Here, The Andersons invoked the words of the contract that Harter signed. That document provides that "[f]ailure to fulfill this contract will result in minimum contract cancellation charges to the seller [Harter], the total of which will be the difference between the contract price and the replacement cost at the time of cancellation, plus the cancellation charge in effect. Seller shall also be liable for The Andersons' attorney fees, cost of collection, plus interest." Appellant's Supp. App.I at 71-83 (duplicates of HTA contracts; attorney's fee provision found at para. 5 in each).

In a similar case in the Ninth Circuit, one party to an arbitral agreement moved to vacate the arbitral award, as Harter did here. See LaFarge Conseils et Etudes v. Kaiser Cement & Gypsum Corp., 791 F.2d 1334 (9th Cir. 1986). The court concluded that the motion was an action "based on the contract," which provided for attorney's fees in actions to enforce the contract. See id. at 134. Therefore, the party that successfully defended the motion to vacate was entitled to reimbursement for fees expended in that defense. See id. Analogously, The Andersons, which successfully defended against Harter's motion to vacate, was entitled under the terms of the contract to seek reimbursement from the district court for fees expended in that defense. For the district court to consider and grant such a request was not an abuse of discretion.

Harter next argues that the trial judge erred in awarding fees for litigation ancillary to The Andersons' enforcement of the arbitral award. This "collateral" litigation included:

Harter's unsuccessful interlocutory appeal from the district court order compelling arbitration. See Appellant's Supp. App.II at 218-25 (Harter v. Iowa Grain Co., No. 96-3907 (7th Cir. July 15, 1998) (unpublished order)) (also

found at 1999 WL 754333).

Harter's appeal of Rule 11 sanctions against his attorneys, imposed for naming Iowa Grain as a defendant, when there was questionable proof that Iowa Grain was linked to The Andersons in such a way as to make it liable for any alleged wrongdoing. Apparently, The Andersons was involved in discovery related to the litigation, which focused on whether AISC or The Andersons was an agent of Iowa Grain. See Appellant's Supp. App.II at 218-25 (Harter v. Iowa Grain Co., No. 97-2671 (7th Cir. July 15, 1998) (unpublished order reversing award of sanctions against Harter's attorney)) (also found at 1999 WL 754333).

Harter's appeal of the district court's decision to dismiss as a defendant The Andersons' subsidiary AISC. Harter initially named AISC, The Andersons' wholly owned subsidiary, apparently believing that AISC did business as The Andersons (they were in fact separate entities). The district court conditionally dismissed AISC, and we refused to review the dismissal, stating that until the conditions upon which AISC could be reinstated were moot, the dismissal was not a final, appealable order. See Appellant's Supp. App.II at 218-25 (Harter v. Iowa Grain Co., No. 96-4074 (7th Cir. July 15, 1998) (unpublished order dismissing interlocutory appeal)) (also found at 1999 WL 754333).

The Andersons' efforts to limit the scope of Harter's subpoena of the NGFA, served after the NGFA arbitration award was announced. Harter requested from the NGFA information that would help it prove arbitral bias. See Appellant's App.II at 4 (Harter v. Iowa Grain Co., No. 96 C 2936 (N.D. Ill. Oct. 28, 1998) (memorandum opinion and order regarding attorney's fees)).

The Andersons' request for an injunction forcing Harter to place in escrow profits he received on the sale of farm assets. See id.

Harter urges that the fee-shifting provision in the contract applies only to attorney's fees required to pursue a breach of contract action against him. He contends that the proceedings listed above are unrelated to The Andersons' breach of contract claim, and thus do not come within the ambit of the fee-shifting provision. The district judge disagreed, stating that "in each instance Andersons would not have been required to incur, but for Harter's contractual breaches, Andersons' attorney's fees and related expenses . . . ." See Appellant's App.II at 3 (Harter v. Iowa Grain Co., No. 96 C 2936 (N.D. Ill. Oct. 28, 1998) (memorandum opinion and order

regarding attorney's fees)). We review this decision for abuse of discretion. See, e.g., Kossman v. Calumet County, 849 F.2d 1027, 1030 (7th Cir. 1988).

Whether the contract's fee-shifting provision covers satellite litigation is a question of contract interpretation. We interpret the contract with reference to Illinois law./12 In Illinois, "[p]rovisions for attorney's fees are to be construed strictly, and such fees cannot be recovered for any services, unless so provided by the [contract]." Northern Trust Co. v. Sanford, 308 Ill. 381, 389-90 (1923). Further, any ambiguity in a contract must be strictly construed against the party that wrote the contract. See Glidden v. Farmers Auto. Ins. Ass'n, 57 Ill. 2d 330, 336 (1974). Thus, for example, where a contract authorizes the shifting of attorney's fees incurred in contract enforcement, a party may not recover fees incurred in bringing or defending a declaratory judgment action. See, e.g., Zimmerman v. First Prod. Credit Ass'n, 89 Ill. App. 3d 1074, 1076 (1980); Arrington v. Walter E. Heller Int'l Corp., 30 Ill. App. 3d 631, 642 (1975). In addition to limiting the type of action for which a party may recover attorney's fees, Illinois courts have suggested that fee-shifting provisions do not apply to attorney work that has only an indirect connection to the subject matter of the contract. For instance, in Helland v. Helland, 214 Ill. App. 3d 275 (1991), a husband gave his ex-wife a promissory note for $12,000 plus 8 percent interest, and the note called for the husband to reimburse the wife for attorney's fees in the event he defaulted on the obligation. See id. at 276. The husband defaulted, and the wife sued for the $12,000 principal and simple interest, which the husband paid. See id. The wife then petitioned to receive compound interest, and the court rejected her petition. See id. The trial court held that she was entitled to recover attorney's fees expended in pursuit of the compound interest claim, but the appellate court disagreed: "[s]uch a claim obviously was not caused by defendant's default because he had paid the promissory note. . . . [P]laintiff was entitled to attorney fees incurred prior to cure." Id. at 278 (emphasis added).

In a case that more closely resembles Harter's, an auctioneer received a winning bid for farm equipment, but the purchaser's check was returned for insufficient funds. See Kruse v. Kuntz, 288 Ill. App. 3d 431, 432 (1996). The purchaser then signed a written statement agreeing to pay the full amount due by a deadline, plus attorney's fees. See id. He did not meet the deadline, and

the auctioneer filed suit; the purchaser filed a counterclaim seeking recision of the contract and filed a third-party claim against his bank. See id. The court held that the auctioneer was entitled to attorney's fees incurred in connection with the "collateral" counterclaim and third-party claim because those claims were "necessitated" by the purchaser's actions to avoid his contractual obligations. See id. at 436.

In this case, Harter's contract states that "[f]ailure to fulfill this contract will result in minimum contract cancellation charges to the seller [Harter] . . . . Seller shall also be liable for The Andersons' attorney fees, cost of collection, plus interest." Appellant's Supp. App.I at 71-83 (duplicates of HTA contracts; attorney's fee provision found at para. 5 in each). Following the example of Zimmerman and Arrington, we interpret this provision to limit The Andersons to fees incurred to collect its damages under the contract. Thus, applying the principles of Kruse and Helland, it seems that only actions necessary to The Andersons' collection effort are covered by the attorney's fee provision. Harter need not reimburse The Andersons for its discretionary litigation efforts unnecessary to the collection. Clearly, opposing Harter's interlocutory appeal from the district court order compelling arbitration was necessary to collection of damages. These portions of the award are confirmed. Also necessary to The Andersons' collection of damages was The Andersons' request for an injunction forcing Harter to place in escrow profits he received on the sale of farm assets.

The district court, in approving attorney's fees for other collateral litigation, stated that "but for" Harter's actions, The Andersons would not have incurred legal bills. With respect, we believe that Illinois authorities require a more direct link between the losing party's acts and the winning party's attorney's fees than a "but for" relation. At some point, Harter's opponents must take responsibility for their own trial strategy. For instance, clearly unnecessary to the collection of damages was The Andersons' involvement in a co-defendant's effort to recover Rule 11 sanctions from Harter's attorney. Although the district judge correctly stated that but for Harter's legal complaint, co-defendant Iowa Grain would not have moved for Rule 11 sanctions against Harter, that conclusion does not justify attorney's fees. Rather, we must ask whether Harter's actions made the collateral litigation necessary to the collection of fees. We have previously held, in an unpublished opinion, that Harter's lawyer did nothing so

egregious that sanctions were warranted. See Harter v. Iowa Grain Co., 202 F.3d 273 (7th Cir. 1998) (unpublished order) (also found at 1999 WL 754333). Following this logic, the effort to sanction Harter's lawyer for wrongdoing was not required to collect damages. Thus, the onus for the Rule 11 action falls on Iowa Grain, which elected to pursue the sanctions action, and not on Harter. Similarly, The Andersons' effort to limit the scope of Harter's subpoena on the NGFA was not necessary to The Andersons' collection of the arbitration award. Harter sought information from the NGFA that would help him undermine the objectivity of the NGFA process and thus justify vacating the award. In the present circumstances, because the NGFA moved on its own to quash the subpoena and The Andersons elected to duplicate the NGFA's efforts, we do not think The Andersons' effort was necessary to collecting Harter's debt. See Harter v. Iowa Grain Co., No. 98-014 (D. D.C. May 12, 1998) (order quashing subpoena), vacated as moot, Harter v. Iowa Grain Co., No. 98-7108 (D.C. Cir. Oct. 28, 1998).

The most difficult question we address in terms of attorney's fees is whether Harter should be required to repay The Andersons for its appellate defense of the district court's decision to dismiss The Andersons' subsidiary, AISC. Whether AISC was named as a defendant seems anything but crucial to The Andersons right to collect damages in this case. Further, the contract clearly states, "Seller shall also be liable for The Andersons' attorney fees . . ." but not a subsidiary's fees. These two factors militate against fee shifting in this case. But Harter initially named AISC as a defendant because he believed that AISC did business as The Andersons. See Harter, 1999 WL 754335, at *1. Thus, when Harter signed the contract agreeing to bear the attorney's fees of The Andersons, he must have believed he was agreeing to cover the fees of AISC doing business as The Andersons. Given Harter's apparent belief that AISC and The Andersons were essentially the same entity, and given the wide latitude the district court enjoys in awarding attorney's fees, we affirm its decision to allow reimbursement for fees incurred in defense of the AISC dismissal.

Harter's last gasp is a series of complaints about the fees themselves: they were not properly documented, they are excessive, they cover non-legal work, they are duplicative and they were not billed contemporaneously. See Appellant's Br.II at 20-37. Again, a court's award of attorney's fees is reviewed for abuse of discretion. See Ustrak v. Fairman, 851 F.2d 983, 987 (7th Cir. 1988). Harter first argues that The Andersons has inadequately documented the fees.

This is nonsense. Illinois courts have stated that to justify a fee, a petition must specify "the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." Kaiser v. MEPC Am. Properties Inc., 164 Ill. App. 3d 978, 982 (1987). In Fidelity & Deposit Co. of Maryland v. Krebs Engineers, 859 F.2d 501 (7th Cir. 1988), we held that mere testimony that fees and expenses were incurred fell short of the requirement. See id. at 508. Somehow, Harter has adduced from these cases a requirement that the proponent of attorney's fees submit a petition setting forth why the fees were reasonable. See Appellant's Br.II at 24. But detailed billing records that a proponent avers are accurate provide the district judge--who presided over this case--with all the basis he needs to determine whether the fees are reasonable.

The Andersons has provided billing records generated by its law firm, Foley & Lardner, which specify the task completed, the time (in 10-minute increments) spent on the task, and the identity of the attorney who completed the task./13 Descriptions of conferences and phone conversations specify who participated, and descriptions of legal research and analysis specify the motion, hearing or document on which the attorney worked. See Appellant's App.II at 44-87. The Andersons has also submitted an affidavit stating that the billing records accurately reflect Foley & Lardner's work on behalf of The Andersons.

Relatedly, Harter argues that the fees must be unreasonable because together with the fees awarded in arbitration, The Andersons will have recovered $140,000 in order to enforce a $55,000 claim. However, as the trial judge pointed out, Harter elected to bring a class action putting millions of dollars at stake. Further, Harter decided to take interlocutory appeals, thereby driving up the fees at issue. In short, Harter raised the stakes in this litigation, and now must pay for that strategy./14

Harter argues that "excessive and duplicative" work has been charged. What is excessive is a matter of opinion, and under Ustrak, it is the district court's opinion that matters. See 851 F.2d at 987. We cannot say we disagree with the district court's exercise of its discretion in approving these fees. For instance, Harter complains that several of The Andersons' attorneys spent more than thirty hours preparing an appellate brief. Given the numerous and complex issues involved in this litigation, we would be more surprised if the judge had rejected these billings as unreasonable. A properly

drafted appellate brief may require many hours of research, analysis, writing and editing, and we would hardly encourage appellate litigants--who have spent hundreds of hours below--to economize unduly at the appellate level. We affirm the award of attorney's fees for all matters except the NGFA subpoena and the Rule 11 litigation.

VI.  Conclusion

The district court correctly determined that under the parties' contract, the legal status of the HTA contracts and the resulting resolution of claims was a matter for the arbitrators. We AFFIRM the district court's order compelling arbitration. We also agree with the district court that the NGFA arbitration panel did not demonstrate direct bias--the only kind of bias sufficient to require vacation of an arbitral award--in its adjudication of this dispute. We AFFIRM the district court's confirmation of the arbitral award. We agree with the district court's conclusion that Harter is responsible for attorney's fees arising from litigation collateral to the arbitration, except for the fees The Andersons incurred in relation to the Rule 11 litigation and the opposition to the NGFA subpoena. We REVERSE the district court's award of attorney's fees for these two matters, and AFFIRM the remainder of the award.

/1 See, e.g., Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 788-90 (7th Cir. 1999); The Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 318-20 (6th Cir. 1998); Nagel v. ADM Investor Servs., Inc., 65 F. Supp. 2d 740, 750-53 (N.D. Ill. 1999); Barz v. Geneva Elevator Co., 12 F. Supp. 2d 943, 953-54 (N.D. Iowa 1998); Top of Iowa Coop. v. Schewe, 6 F. Supp. 2d 843, 853-58 (N.D. Iowa 1998); In re Grain Land Coop., 978 F. Supp. 1267, 1272-77 (D. Minn. 1997).

/2 See, e.g., In re Grain Land Coop., CFTC Docket No. 97-1 (Nov. 6, 1998); In re Competitive Strategies for Agric. Ltd., CFTC Docket No. 98-4 (Aug. 24, 1998). One district court has refused to dismiss a claim similar to Harter's on a Rule 12(b)(6) motion, reasoning that whether the HTAs in that case were futures contracts was a question of fact rather than of law. See Gunderson v. ADM Investor Servs., Inc., No. C96-3148-MWB, 2000 WL 235390 (N.D. Iowa, Feb. 28, 2000).

/3 At that time, a subsidiary, Andersons Investment Services Corp. (AISC), cleared its transactions through FCM Iowa Grain. The same individual manages The Andersons' facility and the AISC

operation at the Dunkirk, Indiana, office with which Harter dealt.

/4 Harter originally brought two appeals, which have been consolidated, but he filed separate briefs and separate appendices. We will refer to the first brief, appendix and supplemental appendix, pertaining to the Commodity Exchange Act claims, as Br.I, App.I and Supp. App.I. We will refer to the second set of materials, pertaining to attorney's fees, as Br.II, App.II and Supp. App.II.

/5 Harter implies that because the dispute here involves interpretation of a federal statute, rather than a common-law claim, the dictates of the Federal Arbitration Act are trumped by the Commodity Exchange Act. He is wrong. Numerous courts have held that claims under the CEA are arbitrable. See, e.g., Tamari v. Bache & Co. (Lebanon) S.A.L., 565 F.2d 1194, 1200 (7th Cir. 1977) (Tamari II). See also Smoky Greenhaw Cotton Co., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, 720 F.2d 1446, 1449-50 (5th Cir. 1983); Ingbar v. Drexel Burnham Lambert Inc., 683 F.2d 603, 605 (1st Cir. 1982); Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 682 F.2d 459, 460 (3d Cir. 1982). Further, the dispute aimed at nullifying the contract in Sweet Dreams Unlimited, Inc. v. Dial-a-Mattress Int'l, Ltd., 1 F.3d 639 (7th Cir. 1993) involved interpretation of an Illinois statute; we pointedly held that the FAA and cases construing it applied. See id. at 642-43.

/6 On the day we heard oral arguments in Harter, a separate Seventh Circuit panel spoke for the first time on the legality of HTA contracts. See Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777 (7th Cir. 1999). Harter explained at oral argument and in a supplemental brief that if we decided the HTA contracts were legal as a matter of law, then he would not have a valid "claim" under the CEA, meaning the contracts and the arbitration clauses in them would be presumptively valid. See Appellant's Supp. Br. at 2. Conversely, if we decided in Lachmund that the legality of HTA contracts is a question of fact, then Harter maintains we must consider his CEA claim presumptively valid, and these contracts and arbitration clauses presumptively invalid. See id. We decided in Lachmund that the legality of HTA contracts is a question of fact. But for reasons outlined above, we reject Harter's premise that we must presume his CEA claim is valid and decide the arbitration question based on this presumption. The validity of the CEA claim, and all consequences that follow from it, are questions for the arbitrators.

/7 For the purposes of argument, the district court did indulge Harter's legal contentions. The court assumed that the HTA contracts were futures contracts, but decided that that assumption did not take Harter as far as he would like. The court concluded that even if The Andersons was a futures commission merchant because it dealt in a "futures" contract, and even if it was therefore governed by CFTC arbitration regulations, this particular dispute was not susceptible to those regulations. The court hypothesized that Harter was not a "customer" protected by the regulations because The Andersons did not directly trade on the Chicago Board of Trade. See 17 C.F.R. sec. 180.1(b). The court found that the dispute was not a "claim or grievance" governed by the regulations because it required the testimony of third parties over whom the relevant contract market did not have jurisdiction. See 17 C.F.R. sec. 180.1(a). We do not necessarily agree. As Harter urges, if the HTAs were futures instruments, then The Andersons arguably might have traded on the Board of Trade, and arguably should have been registered with the Board of Trade. The Board may then have had jurisdiction over some of the key witnesses. But our disagreement with the district court on this point is of no moment. The court was not obliged to adopt Harter's legal view of the contracts, and we are not obliged to apply legal results that follow from them. The status of the contracts was a matter for the arbitrators alone. No matter how Harter phrases his disagreement with the district court on this point, he will be rudely awakened by the holdings of Sweet Dreams and like precedents.

/8 Further, it seems to us Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 626-27 (1985) may deal a serious blow to Marchese. That case held that unless Congress specified otherwise, statutory rights were not to be treated differently under arbitration agreements than contractual rights. See id. at 626-27. Neither party addresses this issue, perhaps because they understand Marchese to hold that only pure questions of law--statutory or contractual--may be better handled by the courts than by arbitrators. Because we reject the application of Marchese in this case, we need not assess its ongoing validity in light of Mitsubishi.

/9 About one thousand grain merchandising companies, which operate more than five thousand facilities, belong to the NGFA. Appellant's Br.I at 30 n.28. Of the NGFA's grain elevator members, about 45% offer HTA contracts. Amicus Br. at 13 n.10.

/10 Notably, the legislative and judicial enthusiasm for arbitration does not extend to arbitration

clauses contained in contracts of adhesion. The Federal Arbitration Act explicitly allows the courts to give relief where the party opposing arbitration presents "well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" Mitsubishi, 473 U.S. at 627 (quoting 9 U.S.C. sec. 2). Indeed, both Judge Swygert and Judge Clark, in opposing the specific arbitrations before them, were motivated by the apparent oppression involved in the contracts at issue. Judge Swygert specifically stated that he assumed the contracts at issue in Tamari were contracts of adhesion. 565 F.2d at 1204 (Swygert, J., dissenting). Judge Clark stated that in six pages of "finely printed" boilerplate language drafted by the brokerage firm and imposed upon customers, "the intent of the contracting party having the superior bargaining power is not concealed." Wilko, 201 F.2d at 445 (Clark, J., dissenting). Harter does not argue on appeal that these HTA contracts were contracts of adhesion. Therefore, we cannot weigh any commercial oppression that The Andersons may have brought to bear on this individual farmer, and we cannot vacate the award on this ground. Moreover, another farmer challenging his HTA contracts with The Andersons specifically argued the contracts were adhesive. Analyzing the issue under Michigan law, the Sixth Circuit rejected that argument. See Horton Farms, 166 F.3d at 323-26 (finding that farmer failed to show The Andersons was the only grain elevator offering HTA contracts, failed to show the HTA contract terms were non-negotiable, and failed to show that the arbitral process was oppressive).

/11 This position reflects the Supreme Court's admonition in Mitsubishi Motors that courts should presume the parties' selected arbitrators are competent and impartial until presented with evidence to the contrary. 473 U.S. at 633-34.

/12 Harter is a citizen of Indiana; The Andersons is incorporated in Ohio. The Andersons maintains a post office box in Chicago, Illinois, and instructs farmers that payments should be made to that address. Moreover, Harter suggests that if the HTA contracts were futures contracts, they should have been traded on the Chicago Board of Trade; The Andersons' relationship to the CBOT is also a factor in the resolution of the legal status of the contracts. Further, Iowa Grain, originally a defendant, is incorporated in Illinois, where the lawsuit was filed. The contract itself, which envisioned that all disputes would be resolved in arbitration, states that it is made "in accordance with the Grain Trade Rules" of the NGFA and that any disputes

would be arbitrated by the NGFA, "pursuant to its arbitration rules." Appellee's App. at 213. Thus, the parties did not select a state law to apply to the contract. Ordinarily, this would require us to undertake a choice of law analysis. However, Harter assumes that Illinois law applies. See Appellant's Br.II at 8-9. And The Andersons does not dispute this assumption; in fact, it cites two Illinois cases dealing with the proper method of billing for attorney's fees. Appellee's Br. at 44. Where the parties agree on the law that governs a dispute, and there is at least a "reasonable relation" between the dispute and the forum whose law has been selected by the parties, "we will forego an independent analysis of the choice-of-law issue and apply [the parties' choice]," Bird v. Centennial Ins. Co., 11 F.3d 228, 231 n.5 (1st Cir. 1993). The parties agree that Illinois law applies, and there are numerous contacts with Illinois suggesting a "reasonable relation" between that state and the dispute. Thus, we apply Illinois law.

/13 Some billing entries are attributed to unidentified timekeepers. Although this practice is not ideal, we recognize that in large law firms with numerous billing attorneys, it may occasionally be unavoidable. It does not vitiate this otherwise adequate fee petition. Similarly, billing separately for services other than attorney time is a well-accepted law firm practice. We agree with the district court that such non-legal billings were proper.

/14 Harter continues his aggressive tactics by representing to us that Foley & Lardner engaged in fraud. Foley & Lardner's billing records furnished to the NGFA include entries that read "Redact Anderson bills so they only reflect 'Harter v. Andersons.'" Harter contends that this redaction was intended to "dupe the NGFA into granting its full request [for fees.]" Unlike Harter, we are not at all sure what is meant by this entry; the firm could have been trying to make sure Harter was not billed for Andersons' work unrelated to his claim. To conclude that the firm was engaging in fraud is unfounded and inflammatory. The district court had an opportunity to review the records, probe counsel for their meaning and entertain the "fraud" argument. We are satisfied that if it did not view this entry as fraud, it did not err.