*In re* SHELLY UPMANN (Shelly Upmann, on Behalf of Jamie Upmann-Terhark, a Minor, Petitioner-Appellant, v. James Terhark, Respondent-Appellee).

Second District    No. 2—89—1227

Opinion filed July 20, 1990.

Paul R. Jenen, of Wheeling, for appellant.

Philip F. Jensen, of Galena, for appellee.

Robert R. Roth, of Vincent, Roth & Elliott, of Galena, guardian *ad litem*.

JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Shelly Upmann (Shelly), appeals from the judgment of the circuit court of Jo Daviess County granting physical custody of her son Jamie to the child's father, James Terhark (James). We affirm.

Jamie Upmann-Terhark was born to Shelly on January 25, 1988. Shelly advised James Terhark, both during her pregnancy and the morning of Jamie's birth, that Jamie was his son. However, it was not until June or July that James sought visitation with his son and commenced paying Shelly the sum of $40 per week to pay for her baby-sitting expenses.

On July 5, 1988, Shelly filed a petition to determine the existence of the father-and-child relationship. An order was entered requiring the parties to submit to blood tests, and the tests disclosed that James was the father of Jamie. An agreed order was entered on September 19, 1988, finding that James was the natural father of Jamie and that he had a duty to support Jamie.

James filed a petition for temporary and permanent custody on October 7, 1988. On October 17, 1988, an agreed order was entered without prejudice providing that James would pay Shelly the sum of $40 per week for child support and providing James with rights to visitation with Jamie.

On December 22, 1988, James filed a petition for rule to show cause, seeking to hold Shelly in contempt of court for her failure to provide him with the court-ordered visitation. A hearing was conducted on February 22, 1989, resulting in the entry of an order holding Shelly in contempt of court.

The trial on James' petition for permanent custody of Jamie was conducted on August 30 and September 19, 1989. On October 24, 1989, the court entered its findings and judgment providing that the parties would be awarded joint legal custody of Jamie with physical custody being placed in James.

Sometime after the entry of the court's order of October 24,

Shelly turned Jamie over to James. On November 17, 1989, Shelly filed her notice of appeal in this cause. An emergency motion for stay of proceedings was filed by Shelly on November 29, 1989, with this court; said motion was denied by order entered December 6, 1989.

Shelly first contends that the trial court erred by applying the wrong standard in awarding custody of Jamie to James. Section 16 of the Illinois Parentage Act of 1984 (Parentage Act) provides in part:

> "The court has continuing jurisdiction to modify an order for support, custody or visitation included in a judgment entered under this Act. Any custody or visitation judgment modification shall be in accordance with the relevant factors specified in the 'Illinois Marriage and Dissolution of Marriage Act,' approved September 22, 1977, as now or hereafter amended." (Ill. Rev. Stat. 1989, ch. 40, par. 2516.)

The relevant factors for modification of a custody judgment are contained in section 610 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) as follows:

> "(a) Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.
>
> (b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, *** and that the modification is necessary to serve the best interest of the child." Ill. Rev. Stat. 1989, ch. 40, par. 610.

Shelly now argues that the court failed to apply the subsection (a) test of serious endangerment to the child's health in making its decision to award physical custody to James and only applied the subsection (b) test of the child's best interests.

Shelly points to the trial court's oral pronouncement of September 19 for evidence that the court only applied the single standard. In its pronouncement, the court stated:

> "[THE COURT]: The Court has had some problem as to what standard to apply in this case under Section 610 in that the Parentage Act states that that should apply. However there is

[*sic*] certain matters wherein it doesn't literally apply and can't and in a paternity action custody becomes vested de facto upon birth.

We can't say that this child has not been in someone's custody for the last twenty-one months. Logic tells us different. However, Section 610 also provides for modification of a prior custody judgment.

It further provides that no prior custody judgment shall be modified within two years of same unless on the basis of affidavits and the Court allows it to be made by reason of serious endangerment to the child's mental, moral, emotional or physical wellbeing [*sic*]. We have had no such affidavits filed in this case and the Court at any rate would not apply that section even though it is within two years of vesting of custody in this case.

The Court further finds that both parents are good, fit and proper persons to have the care, custody, control and education of the minor child. However, with the standard that the Court is going to apply in this case is not going to be one which it would at the end of a marriage or i.e. a divorce, one where both parties would stand equally before the Court.

\* \* \*

What the Court is going to apply is the standard which is applied in Section 610 for change of custody without being within two years of a prior custody judgment and that is that the Court will not modify the custody unless by clear and convincing evidence facts have arisen that were unknown to the Court at the time of the prior custody judgment or have arisen in the meantime and I think the unknown part certainly would apply in that there was no prior custody judgment, however since that time there are certain facts that have arisen in this case which would amount in the Court's opinion to a change of circumstances."

However, the court's written findings and judgment of October 24, in addition to referring to the "best interest" test, also refer specifically to the health of the child:

"The Court having heard the evidence finds that Jamie's present environment seriously endangers his physical, mental, moral and emotional health and that any harm caused to Jamie Upmann-Terhark by being placed with the Petitioner, James Terhark is outweighed by its advantages to the minor child."

Shelly argues that the difference between the oral and written judgments can be attributed to the fact that James' attorney drafted the

written findings and judgment. This argument is not persuasive. The trial judge signed the written document as his own. We will not presume that the judge did not read the document or realize what was contained therein. Furthermore, the mere oral pronouncement of judgment does not constitute the entry of judgment; a written order or entry of record is necessary for a judgment to become final. (*Ahn Brothers, Inc. v. Buttitta* (1986), 143 Ill. App. 3d 688, 690-91.) In the case at bar, the final judgment of the court, and that from which the appeal must be taken, is the written judgment. It is clear from the written judgment that the court did apply the test set forth in section 610(a) of the Marriage Act. (Ill. Rev. Stat. 1989, ch. 40, par. 610(a).) We can, therefore, grant no relief to Shelly on this basis.

Having determined that the court did apply section 610(a) of the Marriage Act in making its decision, we must now determine if the court was correct in its application of that section.

A parent-child relationship between James and Jamie was created on September 19, 1988, by virtue of the agreed order of parentage. (See Ill. Rev. Stat. 1989, ch. 40, par. 2504.) This order found that James was the natural father of Jamie and that, as the natural father, he had a duty to support Jamie. Further proceedings were to be held in October. Eighteen days later, on October 7, James filed his affidavit and petition for temporary and permanent custody. On October 17 an agreed order was entered, without prejudice, concerning the areas of support payments and visitation by James.

Section 14 of the Parentage Act provides:

"If a judgment of parentage contains no explicit award of custody, the establishment of a support obligation or of visitation rights in one parent shall be considered a judgment granting custody to the other parent. If the parentage judgment contains no such provisions, custody shall be presumed to be with the mother; however, the presumption shall not apply if the father has had physical custody for at least 6 months prior to the date that the mother seeks to enforce custodial rights." (Ill. Rev. Stat. 1989, ch. 40, par. 2514(a)(2).)

The parentage order contained no explicit award of custody but did establish a support obligation in James. Under this section of the Parentage Act then, it might appear that the order is to be considered a judgment granting custody to Shelly. Therefore, section 610(a) of the Marriage Act would be applicable, as the court's judgment on the custody petition would have modified a prior custody order.

However, we conclude that the parentage order did not constitute a prior custody order. The order did not address the issues

of custody, visitation and amount of support, and it explicitly provided for further proceedings in the case. An order is not final unless it terminates the litigation between parties or disposes of their rights on some definite, separate part of the litigation. (*In re Marriage of Alush* (1988), 172 Ill. App. 3d 646, 650.) By not addressing the issues of custody, support, and visitation, and by providing for further proceedings, the court clearly did not enter a final order. (See *Deckard v. Joiner* (1970), 44 Ill. 2d 412, 417.) Since the order was not final, the court could modify its order at any time. Section 610 of the Marriage Act would then be inapplicable, as that section only applies to the modification of permanent orders.

An opposite outcome on these facts would be troubling. Taken to its logical conclusion, section 14(2) of the Parentage Act would prohibit any man found to be a natural father via petition by the mother from seeking custody of his child for a two-year period if he could not prove that the child's current environment was seriously endangering the child's physical, mental, moral, or emotional health. The only way for a father to seek custody of his illegitimate child would be to file a petition for custody *before* he was found to be the child's natural father. Such a procedure would be untenable and have no legal basis, as the putative father would have no ground to seek custody of a child not proved to be his.

■ In the case before us, James petitioned the court for custody 18 days after he was legally determined to be Jamie's father. This was the first opportunity James had to seek custody of Jamie, and it came only weeks after he learned that he was the father. Under the facts of this case, we conclude that the judgment of custody granted pursuant to James' petition was the first such judgment. Therefore, the court erred in applying section 610 of the Marriage Act. The "best interests of the child" standard set out in section 602 is applicable here.

Shelly next contends that, under either standard, the award of physical custody to James was against the manifest weight of the evidence. We disagree.

■ Unmarried fathers have a substantial and cognizable interest in the custody and care of their children born out of wedlock. (*In re Custody of Horbatenko* (1988), 176 Ill. App. 3d 970, 973.) However, this interest is distinguishable from that of a separated or divorced father in that a father who was for at least a time married to his child's mother would have participated in raising the child during the period of marriage. (*Horbatenko*, 176 Ill. App. 3d at 973.) A putative father must show a substantial concern for the child before he

has acquired standing to assert his interests; his conduct in establishing a significant relationship with the child and in providing for the child are factors to be considered by the court in determining the best interests of the child. (*In re Custody of Bourey* (1984), 127 Ill. App. 3d 530, 534.) The trial court's award of custody will not be disturbed on review unless it is contrary to the manifest weight of the evidence or it works manifest injustice. *Bourey*, 127 Ill. App. 3d at 533.

■■■ In the case before us, the record provides ample evidence to support the trial court's award of custody. James began visiting Jamie approximately four or five months after Jamie's birth and also began making payments to Shelly at that time. These actions were taken prior to the institution of parentage proceedings by Shelly. The record also contains evidence which could explain the gap between Jamie's birth and the establishment of a relationship between Jamie and James. James testified that he and Shelly had engaged in sexual intercourse only two times over a four-month period. In addition, shortly after Jamie was born, Shelly began cohabiting with another man. These facts make understandable the lack of involvement between James and Jamie during the initial months after Jamie's birth. Once James became involved in Jamie's life, however, he built a significant relationship with him. James visited Jamie several times a week and often had Jamie overnight and for entire weekends. James also continued payments to Shelly and purchased food and clothing for Jamie. We conclude that sufficient evidence exists to show a significant relationship between James and Jamie.

■■■ We also find sufficient evidence in the record to support the finding that the child's best interests would be served by granting physical custody to James. During the 21 months that Jamie resided with Shelly, the child's residence had been moved eight or nine times. Shelly had also employed eight or nine different baby-sitters to watch Jamie during that period. The court found that Shelly was lacking in direction and stability and that James had direction in his life and would be a positive role model for Jamie. The record contained evidence of unsanitary conditions and a lack of supervision while Jamie lived with Shelly. In addition, the court heard testimony from a court-appointed investigator and Shelly's expert witness. The court found persuasive the investigator's testimony that the security and stability of Jamie would be best served by placing him with James. Shelly's expert witness, Dr. Busby, was found by the court to be unpersuasive and unreliable. The trial court is in a superior position to view the witnesses and their demeanor as they testify. We will not second-guess the court on the persuasiveness of these witnesses.

After our review of the record, we do not find the court's custody award to be against the manifest weight of the evidence based on either section 610 or section 602. Therefore, we affirm the order of the circuit court of Jo Daviess County.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.