# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730

| | |
|---|---|
| Appellate Court Caption | ERNESTINE WATSON, as Independent Administrator of the Estate of WILLIAM SLOAN, Deceased, Plaintiff-Appellant, v. SOUTH SHORE NURSING AND REHABILITATION CENTER, LLC, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-3730 |
| Filed | February 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a survival and wrongful death action arising from the fatal injuries suffered by plaintiff's father while a patient in defendant's nursing home when he accidentally set himself on fire while smoking without supervision, the jury's failure to award any damages for loss of society was against the manifest weight of the evidence and, therefore, the cause was remanded for a new trial on the issue of damages for loss of society; however, the trial court's award of attorney fees pursuant to the Nursing Home Care Act in an amount less than requested by plaintiff was affirmed where the trial court's reduction of plaintiff's claim was not so unreasonable as to constitute an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2009-L-014819; the Hon. Donald J. Suriano, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded. |

| | |
|---|---|
| Counsel on Appeal | Albert E. Durkin, Joseph J. Miroballi, Lauren A. Levin, and Jessica R. Durkin, all of Miroballi, Durkin & Rudin, LLC, of Chicago, for appellant. |
| | Joseph P. Kincaid, Catherine Basque Weiler, and Megan E. Schneider, all of Swanson, Martin & Bell, LLP, of Chicago, for appellee. |
| Panel | JUSTICE J. GORDON delivered the judgment of the court, with opinion. Presiding Justice Epstein and Justice McBride concurred in the judgment and opinion. |

## OPINION

¶ 1    This case is a survival and wrongful death action arising out of the death of William Sloan, a patient at a nursing home operated by defendant-appellee South Shore Nursing and Rehabilitation Center, LLC, and defendant Care Centers, Inc. It is undisputed that, on July 24, 2004, while Mr. Sloan was unsupervised inside the facility, he attempted to smoke a cigarette and caught on fire. He suffered severe burns which led to an infection that caused his death on June 10, 2006, at the age of 86.

¶ 2    After Mr. Sloan's death, his daughter Ernestine Watson, in her capacity as administrator of his estate, brought the instant suit against South Shore and Care Centers, claiming that Mr. Sloan's death was due to their negligence in leaving him unsupervised with smoking materials. She sought survival and wrongful death damages arising out of common law negligence claims and alleged violations of the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2008)). Following a trial, the jury found in favor of Care Centers but against South Shore. It awarded damages in the amount of $1,650,547.86 for Mr. Sloan's medical expenses, pain and suffering, disfigurement, and loss of normal life, but it awarded no damages for loss of society. Subsequently, plaintiff petitioned for attorney fees in the amount of $568,187.50 pursuant to the Nursing Home Care Act, which provides for the award of reasonable attorney fees to prevailing plaintiffs, but the trial court only awarded plaintiff $322,110 in attorney fees.

¶ 3    Plaintiff now appeals, contending that the jury's award of no damages for loss of society was against the manifest weight of the evidence, thus entitling her to a new trial on the issue of damages for loss of society, and also contending that the trial court erred in not awarding attorney fees in the amount requested. South Shore does not raise any cross-appeal. For the reasons that follow, we affirm the trial court's grant of $322,110 in attorney fees, but we find that plaintiff is entitled to a new trial on the issue of damages for loss of society.

## I. BACKGROUND

On May 8, 2007, plaintiff filed her instant amended complaint against South Shore and Care Centers. In her complaint, she alleged that, at all times material to the action, Mr. Sloan was a patient at a nursing home owned and operated by South Shore, a corporation engaged in the custodial care of elderly and helpless individuals in need of nursing care and treatment. Care Centers was a nursing home management company providing services to and for South Shore.

The complaint stated that, while Mr. Sloan was in the care of South Shore, his clinical records indicated that he required close monitoring while smoking, and defendants therefore ordered their agents and employees to prevent him from smoking without supervision. Notwithstanding these orders, on July 24, 2004, Mr. Sloan was allegedly left unsupervised in the dining area of South Shore with smoking materials. He was found "engulfed in flames" by defendants' employees and suffered third degree burns to 30% of his upper body which were the proximate cause of his death on June 10, 2006.

The complaint sought relief in four counts. In count I, common law negligence, plaintiff alleged that defendants were negligent in failing to properly monitor Mr. Sloan and failing to secure all smoking materials from him. In count II, plaintiff alleged that defendants violated the Nursing Home Care Act, which provides, in relevant part, that "An owner, licensee, administrator, employee or agent of a facility shall not abuse or neglect a resident." 210 ILCS 45/2-107 (West 2006). Plaintiff alleged that defendants committed neglect by failing to provide adequate supervision and oversight for Mr. Sloan. In count III, survival, plaintiff alleged that as a proximate result of defendants' conduct, Mr. Sloan suffered personal injury, including pain and suffering, mental anguish, fright, disfigurement, emotional distress, and humiliation. In count IV, wrongful death, plaintiff alleged that Mr. Sloan left surviving daughters who, as a result of their father's death, suffered injuries in their means of support and loss of their father's society.

Prior to trial, plaintiff filed a motion *in limine* barring any testimony regarding Mr. Sloan's preexisting medical conditions or allegations of alternative causes of death. Plaintiff argued that such testimony would be without foundation and extremely prejudicial, since there had been no expert opinion testimony disclosed pursuant to Illinois Supreme Court Rule 213(f)(2) or Rule 213(f)(3) (Ill. S. Ct. Rs. 213(f)(2), (f)(3) (eff. Jan. 1, 2007)) that any of Mr. Sloan's preexisting medical conditions caused or contributed to his death. The trial court granted this motion with the exception that the parties could introduce evidence that Mr. Sloan previously had had a stroke and that he smoked cigarettes.

The case proceeded to trial. At trial, the parties stipulated that, as a result of his attempt to light a cigarette, Mr. Sloan suffered first-, second-, and third-degree burns on his head, face, chest, neck, and arms. These burns caused him to get an infection that was the proximate cause of his death on June 10, 2006. The parties also stipulated that Mr. Sloan incurred medical bills totaling $1,200,547.86 as a result of the incident.

Ann Livingston, Mr. Sloan's daughter, testified for plaintiff. Mr. Sloan had five daughters: Margaret Sloan (deceased at the time of trial), herself, Ernestine Watson, Gwendolyn Jackson, and Sharon Sloan. She testified that, while she was growing up, their

family was very close-knit, and Mr. Sloan was "the nucleus of our lives." She said that she loved her father all of her life and was very proud of him. All the way up until his accident, she said, he was a source of confidence and advice when she needed it. She also stated that her father's father lived to be 92 years old, and her father's mother lived to be 99.

¶ 11     Ann stated that in the late 1990s, her mother, Margaret Sloan (Mrs. Sloan), was diagnosed as being in the early stages of Alzheimer's disease. The family decided that she needed continual care and, in 2000, placed her in South Shore. Mr. Sloan was not yet in South Shore but, after his wife was placed in South Shore, was living by himself in an apartment. Ann said that the sisters took care of their father and visited him daily. One day, Ernestine came to visit her father and found that he had fallen the night before and was unable to get up. Ann stated that the sisters were concerned over his safety and his ability to take care of himself. As a result, in 2002, they decided to place him in South Shore as well. Although Ann was living out of state at this time, she said that she would visit her father in South Shore three to five times a year and kept phone contact "all of the time." She testified that the other sisters visited their parents at South Shore on a weekly basis and would bring them home on weekends.

¶ 12     Ann testified that, on the day of the accident, July 24, 2004, she and her husband were visiting in town. Together with Ernestine and Sharon, they used the occasion to visit Mr. Sloan. They arrived around 4 p.m. Ann stated that Mr. Sloan was smiling and alert, chatting about the Cubs and about his grandchildren. Before dinner was served, Ann and the other visitors left in order to go shopping for Mr. Sloan. While they were shopping, Ann said, Ernestine received a phone call that Mr. Sloan had been in an accident. They went to the emergency room and were directed to the burn unit, where Ann saw her father "totally wrapped from head to foot." Ann said that the administrator of South Shore subsequently told her that her father had set himself on fire by smoking and dropping his cigarette.

¶ 13     Ann testified that, although her father lived, he never talked to her or smiled at her again, although he would follow her with his eyes. She said that he was not able to breathe independently and was confined to a hospital bed for the last 23 months of his life. Mrs. Sloan died on June 6, 2006, and Mr. Sloan died four days later, on June 10, 2006.

¶ 14     On cross-examination, Ann testified that, in the 1980s, Mr. Sloan had a stroke that weakened his right arm. However, she said, he was still able to carry on his daily activities "[t]o a certain extent." She also testified that he smoked for all of his adult life.

¶ 15     Sharon Sloan, another of Mr. Sloan's daughters, testified for plaintiff. She said that, while she was growing up, her father was kind and loving and always there for her if needed. "He was my shepherd," she said. "He led me through life." Sharon stated that before the accident occurred, while he was in the nursing home, he enjoyed her company. She visited often, and they would have birthday parties and dinner together on holidays. She did these things because she loved him, and she felt that he always loved her. Before the fire, Sharon said, her father could talk and walk. After the fire, he was not able to talk but "would just stare at you."

¶ 16     Ernestine Watson also testified on her own behalf. She stated that her father was a good father, always there for his daughters, even after they were grown. She testified that he was

kind and gentle and made his daughters understand that they were to treat others the way they wanted to be treated. While he was in South Shore, Ernestine would visit him during her lunch hour and in the evenings.

¶ 17    Ernestine testified that her life changed a lot as a result of the accident and her father's subsequent death. "I don't have that strong figure," she said, "because my father was there for all of us. And he–I don't care what his age was, he was always there. And he's not there for us any more."

¶ 18    Plaintiff also called two South Shore employees to testify on her behalf. The first was Carlotta Stuttley, who was a licensed practical nurse at South Shore in 2004, when the accident occurred. Stuttley testified that the family visited Mr. Sloan and was concerned about his welfare. Ernestine in particular visited "very frequently."

¶ 19    Mary Strickland, the director of nursing for Care Centers at South Shore, testified that, based on her observations, the Sloan family was very close. She said that one of Mr. Sloan's daughters visited "like every day, sometimes twice a day." Another visited frequently. A third was living out of town, but she would visit whenever she was in town.

¶ 20    At the conclusion of the trial, the jury found in favor of defendant Care Centers but against defendant-appellee South Shore. It assessed damages of $1,650,547.86, itemized as follows: $1,200,547.86 for medical expenses, $150,000 for loss of normal life, $150,000 for pain and suffering, and $150,000 for disfigurement. However, it gave plaintiff $0 for loss of society.

¶ 21    Subsequently, on June 10, 2010, plaintiff filed two postverdict motions: a posttrial motion seeking a new trial on damages for loss of society and a petition to recover costs and fees pursuant to the Nursing Home Care Act (210 ILCS 45/3-602 (West 2008)). The issues raised in these two motions are the matters at issue in this appeal.

¶ 22    In her initial petition to recover costs and fees, plaintiff stated that she had signed a contingency fee agreement with counsel whereby she agreed to pay one-third of any gross recovery prior to the deduction of costs. One-third of the $1,650,547.86 judgment totaled $550,182.62. Therefore, she contended that she was entitled to recover that amount from South Shore. Plaintiff also stated that she sought to recover all costs associated with the litigation and would submit a summary of those costs at a later date.

¶ 23    On September 24, 2010, the trial court held a hearing on plaintiff's motions. Although the court did not rule upon plaintiff's motions on that date, it indicated that it did not consider plaintiff's contingency fee agreement to be a reasonable basis upon which to grant fees under the Nursing Home Care Act.

¶ 24    Accordingly, on October 20, 2010, plaintiff provided a summary of fees itemizing the hours that her counsel allegedly spent on the case and the applicable hourly rates. Pursuant to that summary, plaintiff claimed that she was entitled to legal fees totaling $543,187.50. Plaintiff subsequently submitted a request for an additional $25,000 in fees for posttrial work, bringing her requested fee total to $568,187.50.

¶ 25    South Shore filed an objection to plaintiff's summary of fees on October 29, 2010, claiming that the summary was "riddled with duplicative billings, broad overestimates and blatant inaccuracies." South Shore attached a copy of plaintiff's summary of fees and

conducted a section-by-section analysis of that document in which it detailed the specific line items and hourly rates that it contended were unreasonable. After deducting such fees, South Shore arrived at a total sum of $309,610, which it argued would be a reasonable award of attorney fees.

¶ 26    The trial court held a second hearing upon plaintiff's motions on November 10, 2010. At that hearing, it denied her motion for a new trial, finding that the zero-damage award for loss of society was not against the manifest weight of the evidence. It also found that the sum of attorney fees requested by plaintiff in her summary of fees, $550,182.62, was not reasonable. Rather, the court decided to award her the amount conceded by South Shore to be reasonable, $309,610, plus half of the amount that plaintiff sought for posttrial work, $12,500, for a total award of $322,110.00. (South Shore had contended that plaintiff was not entitled to any fees for the preparation of her summary of fees.) The court also awarded plaintiff all of her claimed costs, which are not at issue in this appeal.

¶ 27    Plaintiff timely filed the instant appeal. Defendants do not raise any cross-appeal.

¶ 28                               II. ANALYSIS

¶ 29    On appeal, plaintiff raises two contentions of error: first, that the trial court erred in not granting her a new trial on damages for loss of society, and second, that the trial court erred in not granting attorney fees in her requested amount.

¶ 30                       A. Damages for Loss of Society

¶ 31    Plaintiff's first contention is that she was entitled to a new trial on the issue of damages for loss of society, because the jury's decision to award zero damages for loss of society was against the manifest weight of the evidence.

¶ 32    We review the circuit court's decision denying plaintiff's motion for a new trial on an abuse of discretion standard. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006). In doing so, we are mindful that a jury's award of damages is a question of fact and, as such, is entitled to substantial deference by the court. *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996). Thus, a jury's award of damages may only be overturned if the court finds that (1) the jury ignored a proven element of damages, (2) the verdict resulted from passion or prejudice, or (3) the award bore no relationship to the loss. *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453, 470 (2008). In this case, plaintiff argues that the jury ignored a proven element of damages, since the uncontroverted testimony of Mr. Sloan's daughters and South Shore employees showed that his daughters were deprived of his society by his death. We agree.

¶ 33    Plaintiff in this case is seeking to recover loss of society damages pursuant to the Wrongful Death Act, which provides that the jury in a wrongful death suit may award damages to compensate the surviving spouse and next of kin for the "pecuniary injuries" resulting from the person's death. 740 ILCS 180/2 (West 2008). Such damages are premised upon a rebuttable presumption that the surviving spouse and next of kin would have had a reasonable expectation of benefits from the continuation of the life of the deceased. *Chrysler*

*v. Darnall*, 238 Ill. App. 3d 673, 679 (1992).

¶ 34    In *Elliott v. Willis*, 92 Ill. 2d 530, 540 (1982), our supreme court rejected the notion that "pecuniary injuries" within the meaning of section 2 of the Wrongful Death Act were limited to economic losses. Rather, the court held that, in a wrongful death suit, a widowed spouse could recover for her loss of consortium. *Elliott*, 92 Ill. 2d at 540. The court explained:

> " '[A]n individual member of a family has a value to others as part of a functioning social and economic unit. This value is the value of mutual society and protection, in a word, companionship. The human companionship thus afforded has a definite, substantial, and ascertainable value and its loss forms a part of the "value" of the life we seek to ascertain.' " *Elliott*, 92 Ill. 2d at 540 (quoting *Smith v. City of Detroit*, 202 N.W.2d 300 (Mich. 1972)).

Two years later, in *Bullard v. Barnes*, 102 Ill. 2d 505, 516-17 (1984), our supreme court further extended "pecuniary injuries" to include the loss of society experienced by a parent upon the death of a minor child, explaining that "the chief value of children to their parents is the intangible benefits they provide in the form of comfort, counsel and society." Appellate courts have subsequently applied the reasoning of *Elliott* and *Bullard* to allow recovery for loss of society to minor children of a deceased parent (*Turner v. Williams*, 326 Ill. App. 3d 541, 548 (2001) (in wrongful death suit, plaintiff children entitled to recover damages for the "deprivation of love, companionship, and affection" from their father)) as well as adult children of a deceased parent (*Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 206 (1996) (upholding loss-of-society award to adult children of deceased where testimony established that the children kept in close contact with the deceased, saw him regularly, and enjoyed close relationships with him)).

¶ 35    Although the term "society" eludes precise definition, the United States Supreme Court has stated that it encompasses "a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 584-87 (1974).[1] Illinois courts have used similar terms to describe society, speaking of "counsel" and "comfort" (*Bullard*, 102 Ill. 2d at 517) as well as "love, companionship, and affection" (*Turner*, 326 Ill. App. 3d at 548). However, loss of society does not include the grief and mental anguish resulting from the death, and such damages are therefore not recoverable in a wrongful death suit. *Turner*, 326 Ill. App. 3d at 548.

¶ 36    Thus, the issue in the instant wrongful death suit is whether, under the facts of this case, Mr. Sloan's daughters are entitled to recover for the loss of "love, companionship, and affection" (*Turner*, 326 Ill. App. 3d at 548) from their father as a matter of law. As noted, there is a presumption that, as Mr. Sloan's next of kin, they would have had a reasonable

---

[1]*Gaudet* concerned the scope of damages recoverable in a wrongful maritime death action. *Gaudet*'s holding with regard to maritime actions was subsequently superseded by statute, as recognized in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 30 n.1 (1990). However, insofar as the instant case is not a maritime action, *Gaudet*'s definition of "society" retains its vitality in this context.

expectation of benefits from the continuation of his life. *Chrysler*, 238 Ill. App. 3d at 679. However, that presumption is rebuttable, and the jury may disregard that presumption if it determines that the facts do not support it. *Id.* For instance, the presumption may be rebutted by evidence that the next of kin were estranged from the deceased, because, in such a case, there would be no benefits derived from the continuation of his life. *Bullard*, 102 Ill. 2d at 517. The presumption may also be rebutted by evidence that the deceased would have died from unrelated causes because, in such a case, even absent the defendant's wrongful conduct, there would be no continuation of life from which to derive benefits. *Chrysler*, 238 Ill. App. 3d at 679.

¶ 37    No such evidence was presented in the instant case. On the contrary, the undisputed testimony at trial established that Mr. Sloan's daughters enjoyed his love, companionship, and affection during his life and, correspondingly, were deprived of such benefits upon his death. Ernestine, Sharon, and Ann all testified to the companionship they enjoyed with their father while he was a patient at South Shore. Ernestine testified that she routinely visited her father at South Shore over her lunch hour and in the evenings, and the loss of his companionship left a significant impact on her: "I don't care what his age was, he was always there. And he's not there for us any more." Sharon testified that she visited her father frequently, and the family would have birthday parties and dinner on holidays together. She said that she loved her father and felt that he always loved her. Ann testified that, although she lived out of state, she would visit him three to five times a year and remained in constant phone contact. The daughters' testimony in this regard was corroborated by the testimony of South Shore employees Stuttley and Strickland, both of whom testified to the frequent visits of Mr. Sloan's daughters. Strickland further opined, based upon her observations, that the Sloan family was very close. See *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 206 (1996) (upholding loss-of-society award to adult children of deceased where testimony established that the children kept in close contact with the deceased, saw him regularly, and enjoyed close relationships with him). Moreover, no evidence was presented to rebut this testimony by, for example, showing any estrangement between Mr. Sloan and his daughters. See *Bullard*, 102 Ill. 2d at 517 (defendant in wrongful death suit may rebut presumption of loss of society by presenting evidence that the next of kin were estranged from the deceased).

¶ 38    South Shore argues that the daughters' testimony focused on their childhood memories of their father and on their grief at his death, neither of which forms a basis for compensation for loss of society. See *Turner*, 326 Ill. App. 3d at 548 (loss of society does not include grief and mental anguish). However, although the daughters certainly discussed these subjects, they also offered unrebutted testimony as to their continuing relationships with him while he was in South Shore and the love, companionship, and affection they shared with him until his death, as described above.

¶ 39    A jury may not arbitrarily reject the testimony of an unimpeached witness. *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981). Rather, "[w]here the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded even by a jury." *Id.* (in paternity suit, where plaintiff testified that defendant was the only

-8-

person with whom she had intercourse during the critical period, and there was no testimony to raise a contrary inference or question the plaintiff's credibility, judgment *n.o.v.* in plaintiff's favor was warranted despite the trial judge's observation that plaintiff seemed " 'flaky' "). In the present case, notwithstanding the fact that Mr. Sloan was in a nursing home, the testimony presented at trial as to the companionship that Mr. Sloan shared with his daughters was not contradicted, nor is it inherently improbable that daughters in a close-knit family would enjoy the company of their elderly father, particularly where the testimony showed that Ernestine visited him daily and sometimes twice daily, and Sharon visited frequently. In addition, the credibility of the witnesses on this matter was not impeached. Consequently, the unrebutted testimony permits no reasonable inference other than that, if Mr. Sloan had lived beyond June 10, 2006, the daughters would have continued to enjoy his love, companionship, and affection.

¶ 40    Moreover, there was no evidence presented to permit the jury to conclude that Mr. Sloan had a shortened life expectancy such that he might have died of other causes if the accident had not occurred. On the contrary, according to the United States Department of Health and Human Services National Vital Statistics Reports Life Table, which was entered into evidence, the average life expectancy of an 86-year-old black male was six years. In addition, Ann testified that her father's parents lived to be 92 and 99 years of age, which plaintiff argues as evidence of Mr. Sloan's probable longevity, an argument to which South Shore offers no objection or other response in its brief. There was no expert medical testimony to indicate that Mr. Sloan suffered from any life-threatening conditions at the time of the accident that would have caused his death in the same time frame as his death resulting from the accident.

¶ 41    In this regard, we note that South Shore cites, as support for the jury's verdict, the medical conditions suffered by Mr. Sloan that were excluded from evidence at trial pursuant to plaintiff's motion *in limine*. However, South Shore does not challenge the granting of plaintiff's motion on appeal. Since evidence of these conditions was never presented to the jury, it could not have formed the basis for the jury's decision not to award any damages for loss of society.

¶ 42    Thus, we find the instant case to be analogous to *Casey v. Pohlman*, 198 Ill. App. 3d 503 (1990), and *Stamp v. Sylvan*, 391 Ill. App. 3d 117 (2009), in which zero-damage jury awards were found to be against the manifest weight of the evidence. In *Casey*, 198 Ill. App. 3d at 505, the plaintiff driver brought personal injury suit for damages sustained in an automobile collision, and the driver's wife correspondingly sought damages for loss of consortium. The jury entered a verdict in favor of both plaintiffs but awarded no damages to the wife. *Id.*. The *Casey* court found the jury's award of no damages for loss of consortium to be against the manifest weight of the evidence, given clear evidence at trial that the wife suffered loss of her husband's companionship as a result of his injuries. *Id.* at 510. Thus, the court reversed that portion of the judgment concerning the wife's consortium award and remanded for a new trial on that issue. *Id.* at 512.

¶ 43    Similarly, in *Stamp*, 391 Ill. App. 3d at 117, the plaintiff brought a personal injury action arising out of an automobile accident. The jury returned a verdict awarding damages for medical expenses for the six-month period following the accident but failing to make an

award for pain and suffering or loss of a normal life. *Id.*. The circuit court granted plaintiff's motion for a new trial on damages for pain and suffering and loss of normal life during the six months following the accident, and the *Stamp* court affirmed, finding that the jury verdict was "irreconcilably inconsistent" where the uncontroverted evidence showed that plaintiff suffered injury to her neck and back during that six-month period. *Id.* at 126. See also *Manders v. Pulice*, 44 Ill. 2d 511, 516 (1970) (in suit arising from automobile collision where jury found in favor of plaintiff but awarded zero damages to the plaintiff's husband for loss of consortium, the jury's zero-damage award on the loss of consortium claim was against the manifest weight of the evidence, since testimony at trial showed that the wife was active and had a pleasant disposition prior to the accident, but afterwards became withdrawn and uncommunicative, and the husband had lost wages for time he took off work to bring his wife to doctors); *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453, 472 (2008) (against manifest weight of evidence for jury to award injured railroad worker damages for pain and suffering and economic loss but not for disability where "the uncontroverted evidence was that plaintiff was disabled for a certain period of time after the accident").

¶ 44      *Chrysler*, 238 Ill. App. 3d 673, cited by South Shore on this point, is readily distinguishable, insofar as there was evidence in that case to permit an inference that the defendant's conduct did not actually deprive plaintiff of society. *Chrysler* was a wrongful death suit against the physician of the deceased. *Id.* at 675. The jury found the defendant physician liable but awarded no loss of society damages to the deceased's daughter. *Id.* at 675. On appeal, the *Chrysler* court found that this was not against the manifest weight of the evidence where there was expert testimony at trial that the deceased was suffering from multiple life-threatening conditions and would have died from causes unrelated to the defendant's treatment of him around the same period of time. *Id.* at 679. By contrast, in the present case, as noted, there was no expert testimony from which the jury could draw such a conclusion regarding Mr. Sloan's death.

¶ 45      The case of *Flynn v. Vancil*, 41 Ill. 2d 236 (1968), also cited by South Shore, is distinguishable as well. *Flynn* arose out of an automobile accident in which plaintiff and his wife were injured and their two-week-old daughter was killed. *Id.* at 237. The jury found in favor of plaintiff on the issue of liability but awarded no damages for wrongful death. *Id.* Plaintiff appealed, presenting the following certified question of law: "Can a jury verdict of liability for the death of a two-week old female awarding no damages for the administrator for the benefit of the surviving mother and father be sustained where there is evidence of incurable congenital physical defects impairing the health of the child?" (Internal quotation marks omitted.) *Id.*. Plaintiff presented no record of the proceedings or even a narrative of the evidence but only this question of law. *Id.* at 241. Our supreme court answered that the jury verdict could be sustained, finding that it would not necessarily be unreasonable as a matter of law for a jury to conclude that the presumption of pecuniary loss had been rebutted. *Id.* at 238-39. However, loss of society was not at issue in *Flynn*, insofar as the decision was handed down well before our supreme court extended the definition of "pecuniary injuries" to include nonmonetary injuries such as a widowed spouse's loss of consortium (*Elliott*, 92 Ill. 2d at 540) and, more pertinently, a parent's loss of society at the death of a child (*Bullard*, 102 Ill. 2d at 517). Rather, the presumed injury at the time of the *Flynn* decision would have

been an economic injury, arising from the common law presumption that parents were entitled to the services and earnings of their unemancipated minor children. *Bullard*, 102 Ill. 2d at 516; see *Flynn*, 41 Ill. 2d at 238 (noting that good health, industrious habits, and potential longevity of the deceased minor would be relevant in computing such benefits). Accordingly, the lack of recovery in *Flynn* is not analogous to the lack of recovery on plaintiff's loss of society claim in the present case.

¶ 46    Thus, for the reasons stated above, we find that the jury's zero-damage award was against the manifest weight of the evidence and plaintiff is entitled to a new trial on the issue of damages for loss of society.

¶ 47                              B. Attorney Fees

¶ 48    Plaintiff next challenges the trial court's award of attorney fees. First, she contends that the trial court made its ruling without reading plaintiff's summary of fees, which constituted an abuse of discretion. Second, she contends that the fees that she requested pursuant to her fee summary were reasonable given the skill of her attorneys and the substantial time expenditure required to litigate this case. Third, in the alternative to the previous contention, she contends that the one-third contingency fee was reasonable.

¶ 49    The Nursing Home Care Act provides for the award of attorney fees to prevailing plaintiffs. 210 ILCS 45/3-602 (West 2008) ("The licensee shall pay the actual damages and costs and attorney's fees to a facility resident whose rights, as specified in Part 1 of Article II of this Act, are violated."). In awarding fees under the Nursing Home Care Act, only those fees expressly deemed reasonable by the court should be allowed. *Berlak v. Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231, 244 (1996). The plaintiff bears the burden of establishing the reasonableness of the fees sought. *Harris Trust & Savings Bank v. American National Bank & Trust Co. of Chicago*, 230 Ill. App. 3d 591, 595 (1992). A trial court has broad discretion in awarding attorney fees, and its decision will not be reversed on appeal absent an abuse of discretion. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991).

¶ 50              1. Whether the Trial Court Read Plaintiff's Fee Summary

¶ 51    Plaintiff first alleges that the trial court indicated at the November 10, 2010, hearing that it had not read her summary of fees before rendering its decision not to grant fees in the amount requested. We disagree.

¶ 52    As noted, plaintiff presented her summary of fees to the court on October 20, 2010. The record reflects that she delivered additional copies of that summary to the judge on November 5, 2010, and on November 9, 2010. In addition, South Shore attached a copy to its objection to plaintiff's summary of fees, filed on October 29, 2010. Nevertheless, at the November 10, 2010, hearing, the judge stated:

"I did have the opportunity to scrutinize the fee petition like the defendant has, I don't even think I have a copy of all the–well, I did have some things, but it wasn't itemized like what the Defendant has.

    The Defendant has presented a response that I think is somewhat reasonable, and in

responding to a reasonable fee petition, they are arguing or admitting that at least $309,610 is reasonable. So that's good enough for the Court, too."

¶ 53    Plaintiff argues that, when he said "I don't even think I have a copy," the judge was expressing a belief that he had not received any copy of plaintiff's summary of fees and thus had not read it. However, such an interpretation is belied by the context in which this statement was made. The judge indicated that he was basing his fee award, in large part, upon the arguments presented in the objection submitted by South Shore. That objection contained an attached copy of plaintiff's itemization of fees and referred to it extensively in arriving at the figure of $309,610. It is not plausible that someone could read defendant's objection, which the judge apparently did, while remaining unaware of the attached summary of fees to which the objection constantly refers. On the contrary, the judge mentions the itemization that accompanied South Shore's submission, demonstrating that he was well aware of it. Thus, it appears that, even if the judge did not have, or had misplaced, plaintiff's itemization of fees as presented to him via plaintiff's submissions, he nevertheless had a copy of that itemization of fees which was attached to South Shore's objection and, moreover, was aware of this fact. Nor does the judge state at any point that he failed to read that itemization prior to rendering his decision.

¶ 54    It is generally presumed that a judge will read material in his possession that is cogent to his decision. See *People v. Wolski*, 83 Ill. App. 3d 17, 23 (1980) (judge who issues search warrant is presumed to have read warrant and accompanying complaint); *In re Upmann*, 200 Ill. App. 3d 827, 833 (1990) (rejecting petitioner's argument that written judgment drafted by respondent's attorney and signed by judge did not reflect judge's actual grounds for decision, since "[w]e will not presume that the judge did not read the document or realize what was contained therein"); *Kaeding v. Collins*, 281 Ill. App. 3d 919, 928 (1996) (Lytton, J., specially concurring) (in a contempt case based upon the filing of improper pleadings, it can be presumed that the judge will obtain and read the documents in question). In this case, where the judge had the document in question and referenced it during the hearing, and where it was clearly cogent to his ruling, the conclusion that the judge actually read that document is firmly supported.


¶ 55                    2. Whether Plaintiff's Summary of Fees Was Reasonable

¶ 56    Plaintiff next contends substantively that the sum of $543,187.50 contained in her summary of fees was reasonable under the lodestar approach, and the trial court abused its discretion in reducing it to $309,610.

¶ 57    Under the lodestar approach, the starting point for calculating the amount of a reasonable attorney fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Berlak*, 284 Ill. App. 3d at 242-43 (applying *Hensley* lodestar approach to assessing reasonableness of fees under the Nursing Home Care Act). This lodestar figure may be adjusted up or down based upon a broad range of factors, including, though not limited to, the difficulty of the issues involved, the skill required to perform the legal services properly, the experience, reputation, and ability of counsel, the results obtained by the plaintiff, and whether the plaintiff failed

to prevail on unrelated claims. *Hensley*, 461 U.S. at 434; *Berlak*, 284 Ill. App. 3d at 243.

¶ 58 In this case, South Shore attacks both the number of hours and the hourly rates claimed by plaintiff's attorneys as excessive and unreasonable. In support, it cites to the analysis of plaintiff's claimed fees that it presented in its objection, which formed the basis for the trial court's decision.

¶ 59 With regard to the number of hours claimed by plaintiff, South Shore presented the court with an extensive list of billings contained in plaintiff's fee summary that it claimed were unnecessary. For instance, South Shore alleged that plaintiff's attorneys billed time for case management conferences on three days where a review of the court docket on those dates showed that no such conferences were held. South Shore also pointed out that plaintiff's attorneys billed time for sending a deposition notice to someone named "Peterson," who, South Shore claimed, was not a person who was involved in the case. In addition, South Shore claimed that plaintiff's attorneys double-billed certain hours. For instance, in the section on written discovery, there was an entry dated April 4, 2009, for "213(f)," with a series of five dates after it. However, on four of those listed dates, work on "section 213" disclosures was listed separately. Similarly, South Shore pointed out that responses to interrogatories were billed under both correspondence and written discovery, and research to locate witnesses was billed under both correspondence and research.

¶ 60 South Shore also contends that the hourly rates claimed by plaintiff are unreasonable. Plaintiff sought to recover $550 per hour for each of the two partners who appeared at trial, $350 per hour for an associate who appeared at trial, $450 per hour for depositions and travel, and $350 per hour for all other work. South Shore first contends that the hourly rate that plaintiff claims for partners is excessive. Second, it argues that associates should receive a lower hourly rate of pay than partners, but plaintiff does not differentiate between the work done by partners and the work done by associates except for the hours claimed at trial. In that regard, South Shore notes that the rates charged by plaintiff's attorneys far exceed the rates charged by South Shore's attorneys over the same time period. South Shore stated that partner D. Timothy McVey charged $175 to $185 an hour over the course of the litigation, while his associates charged $140 to $160 an hour. Partner Larry Helms charged $300 per hour, and his associates charged $225 an hour.

¶ 61 Plaintiff responds by arguing that a higher hourly rate is justified in her case because her attorneys were more experienced than South Shore's attorneys. Further, while plaintiff admits in her brief that some of the work was done by associates, she alleges that all of that work was "critically managed" by partner Joseph Miroballi. She also alleges that the majority of the claimed hours were spent by Miroballi himself.

¶ 62 Upon review of South Shore's objection, and keeping in mind that we review the trial court's decision for abuse of discretion (*Callahan*, 144 Ill. 2d at 43), and "[w]hat is excessive is a matter of opinion" (*Harter v. Iowa Grain Co.*, 220 F.3d 544, 562 (7th Cir. 2000) (declining to reverse district court's discretionary judgment as to whether claimed fees were excessive)), we find that the trial court's reduction of plaintiff's claimed attorney fees was not so unreasonable as to constitute an abuse of discretion.

¶ 63        3. Whether the One-Third Contingency Fee Was Reasonable

¶ 64        Finally, plaintiff contends that her counsel's one-third contingency fee was reasonable, and the trial court erred in not awarding her attorney fees upon that basis. The sole argument that plaintiff makes as to the reasonableness of the contingency fee under the facts of this case is that the contingency fee, which totaled $550,182.62, was highly similar to the fees based upon the itemization, which totaled $568,187.50.[2] Plaintiff makes the unsupported assertion that the reasonableness of the latter supports the reasonableness of the former. However, as discussed, we have found that the trial court did not abuse its discretion in finding the sum contained in plaintiff's itemization to be unreasonable. Thus, we need not delve further, since plaintiff's argument with respect to the contingent fee is unsound in that it relies upon a faulty premise. See *Bohne v. La Salle National Bank*, 399 Ill. App. 3d 485, 503 (2010) (observing that points not argued in an appellant's brief are forfeited).

¶ 65        Thus, for the foregoing reasons, we affirm the trial court's grant of $322,110 in attorney fees to the plaintiff. However, we reverse the trial court's denial of plaintiff's posttrial motion for a new trial on the issue of damages for loss of society and remand for further proceedings.

¶ 66        Affirmed in part, reversed in part, and remanded.

---

[2]As noted, this sum contains an additional $25,000 in posttrial costs claimed by plaintiff.